**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| GRAYMOR PROPERTIES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: _____ |
| v. | ) | |
| | ) | |
| BATTERY PROPERTIES, INC., and | ) | |
| CMW INTERNATIONAL, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

Plaintiff Graymor Properties LLC, by counsel, for its complaint against defendants Battery

Properties, Inc., and CMW International, LLC, alleges and states:

**THE PARTIES**

1.     Graymor Properties LLC is a limited liability company organized under the laws of

Indiana having its principal place of business in Indianapolis, Marion County, Indiana, and owning

real property located at 70 (a/k/a 55) South Gray Street, Indianapolis, Marion County, Indiana (the

"Property").

2.     Reid Litwack is a citizen of the State of Indiana and is the sole member of Graymor

Properties LLC.

3.     Battery Properties, Inc., is a company incorporated under the laws of Delaware

having its principal place of business in Pittsburgh, Alleghany County, Pennsylvania.

4.     CMW International, LLC, is a limited liability company organized under the laws

of Indiana having its principal place of business in Indianapolis, Marion County, Indiana.

5.     Evergreen Holdings International, LLC, is the sole member of CMW International,

LLC.

6.     CMW Evergreen Management, Inc., is a company incorporated under the laws of Indiana with a principal place of business in Indianapolis, Indiana, and is the sole owner of Evergreen Holdings International, LLC.

## JURISDICTION AND VENUE

7.     This Court has personal jurisdiction over the parties because the parties conducted business in Indiana and the actions giving rise to this complaint took place in Indiana and caused harm to an Indiana citizen.

8.     This court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367, and the state law claims arise from the same common nucleus of operative facts.

9.     Venue is proper in this court pursuant to 28 U.S.C. § 1391(b)(2).

## NATURE OF THE CASE

10.     This lawsuit asserts claims under Indiana's Environmental Legal Action Statute, Indiana Code §§ 13-30-9-1 *et seq.* (the "ELA"), the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9607(a)(4)(B) *et seq.* ("CERCLA"), and negligence for costs incurred and to be incurred by Graymor Properties in responding to the release of hazardous substances at the Property that pose a risk to human health and the environment.

## I.     The Operations at the P.R. Mallory Campus.

11.     In 1926, P.R. Mallory Company began acquiring title to certain parcels of real property, including portions of the Property, to form a manufacturing campus located on East Washington Street in Indianapolis, Indiana (the "P.R. Mallory Campus").

12.     P.R. Mallory began operating a manufacturing facility on the P.R. Mallory Campus producing Carboloy, a composite material consisting of tungsten carbide particles cemented into a cobalt or nickel binder.

13.    By 1929, P.R. Mallory consolidated other operations, from other parts of the country, at the P.R. Mallory Campus.

14.    P.R. Mallory's operations included its Mallory, Yaxley, and Elkon brands that manufactured, among other things, electrical contacts, filament wire, electrical switches, dry disk electrical rectifiers, non-ferrous alloys, bi-metals, vibrators, and condensers.

15.    At this time, P.R. Mallory operated four buildings at the Property: (1) Building A; (2) Building G; (3) Building I; and (4) Building H.

16.    Building A was a three story brick structure that housed the main manufacturing operations of P.R. Mallory, including machining operations.

17.    Buildings G and I were located west of Building A and served as the power house and smoke stack which provided central heating and compressed air for other buildings on the P.R. Mallory Campus.

18.    Building H housed P.R. Mallory's plating operations.

19.    P.R. Mallory's operations at the P.R. Mallory Campus generated wastes including oils, spent solvents, and hazardous waste.

20.    As P.R. Mallory's operations at the P.R. Mallory Campus entered the 1930s, it conducted extensive metallurgical research and continuously pioneered new advances in specialty alloys.

21.    From the 1930s until the beginning of World War II, P.R. Mallory developed and improved a number of products, including radio components, such as tuners, rectifiers, capacitors, condensers, and switches, at the P.R. Mallory Campus.

22.     P.R. Mallory's operations at the P.R. Mallory Campus expanded to include the manufacture of radio "B Battery" with electromechanical vibrators and vibropacks, a key component in all automobile radios at the time.

23.     P.R. Mallory also developed the "Mallosil" process which produced a heavy layer of silver permanently bonded to steel for use in bearings.

24.     These bearings, which were manufactured at the P.R. Mallory Campus, were extensively used in wartime planes and engines.

25.     During World War II, P.R. Mallory created its mercury-oxide battery, dubbed the Mallory Tropical Mercury Battery.

26.     At this time, the United States was in great need of the Mallory Tropical Mercury Battery and the P.R. Mallory Campus was immediately expanded to meet this need.

27.     As P.R. Mallory's product lines expanded in the 1930 and 1940s, the P.R. Mallory Campus was also expanded.

28.     Building B was constructed in 1936 and consisted of 36,000 square feet of floor space.

29.     Building B housed heavy machinery, metal processing, and machining operations.

30.     The machining and metal processing in Building B involved milling, drilling, cutting, lathing, punching, and polishing activities.

31.     Building H, containing P.R. Mallory's plating operations, was expanded in 1940.

32.     Virgin solvent and oil was stored in the central portion of Building H.

33.     In 1941, Buildings C and D were constructed west of Building B and Building H.

34.     Further expansion occurred in 1944 when P.R. Mallory constructed Building L.

35.     The lower floor of Building L served as a wet chemistry laboratory and included a machine shop.

36.     With more industrial space, P.R. Mallory began manufacturing additional products at the P.R. Mallory Campus.

37.     By the late 1940s, the products manufactured by P.R. Mallory at the P.R. Mallory Campus included: mallosil-silver bonded steel, intervalometers, mercury oxide batteries, timers, dry batteries, titanium alloys, capacitors, mercury silver rechargeable batteries, manganese alkaline batteries, metal bearings, semiconductors, tuners, ceramic capacitors, amp-gate diode semiconductors, metal firm precision resistors, tantalum capacitors, inductance printed circuits, ferrous backed aluminum alloy bearings, non-acqueous electrolyte capacitors, electroplated selenium rectifiers, high heat conductive copper alloys, chromium copper alloys, copper nickel silicide, copper beryllium, tantalum-sulphuric acid-silver tantalum capacitors, silver contacts, tungsten contacts, and molybdenum products.

38.     At the same time, P.R. Mallory operated laboratories at the P.R. Mallory Campus including an electronics laboratory, an electro-mechanical laboratory, a chemical-metallurgical laboratory, a physics laboratory, and an engineering laboratory.

39.     P.R. Mallory experienced a 646% increase in production volume between 1940 and 1945.

40.     In the 1950s, P.R. Mallory expanded into the development and production of solid-state components such resistors, capacitors, diodes, and inductors.

41.     During this time, manufacturing boomed for P.R. Mallory.

42.     For instance, P.R. Mallory supplied one customer, Delco Radio, with 10,000 vibrator units *per day*.

43.     With its growing manufacturing operations, P.R. Mallory continued to see a growth in the volume of hazardous substances it used at the P.R. Mallory Campus.

44.     P.R. Mallory's growing sales and operations led it to expand its operations at the P.R. Mallory Campus.

45.     On July 23, 1951, P.R. Mallory acquired additional parcels of real property and built an extension to its Building B, which it identified as Building O.

46.     Building O housed most of the manufacturing operations for the metallurgical division and covered over 100,000 square feet of work space.

47.     As part of this construction, P.R. Mallory installed a substantial floor drain network.

48.     Work areas included shipping, receiving, a quality control laboratory, a metallurgy laboratory, raw material storage, turning and milling, pressing, a tool room, degreasing, powdered metal storage, scrap metal storage, furnaces, product cleaning, heat brazing, welding, and a wastewater treatment plant.

49.     As part of its operations in Building B and Building O, P.R. Mallory used multiple degreasers and parts cleaners that utilized carbon tetrachloride and trichloroethylene ("TCE").

50.     With the acquisition of the parcels for Building O, P.R. Mallory completed the acquisitions of land for its P.R. Mallory Campus.

51.     At this time, the product lines manufactured at the P.R. Mallory Campus consisted of metallurgical products such as resistance welding devices, electronic devices for communications equipment, electrical power devices (such as contacts and switches), and batteries.

52.     Between 1951 and 1956, P.R. Mallory built the final buildings at the P.R. Mallory Campus.

53.     The new buildings were labeled Buildings M and N.

54.     The buildings formed a single structure west of Building H and east of Buildings C and D.

55.     Building M and Building N housed offices, general non-chemical storage, an incinerator, and hazardous and special waste drums.

56.     With the completion of Building M and Building N, the P.R. Mallory Campus was fully built out.

57.     P.R. Mallory's operations at the P.R. Mallory Campus continued to involve the use of hazardous substances and the generation of hazardous waste.

58.     All the while, P.R. Mallory's business continued to grow.

59.     In 1964, P.R. Mallory registered the trademark for "Duracell" and began marketing directly to consumers.

60.     By 1966, P.R. Mallory had over 1,500 employees at the P.R. Mallory Campus.

61.     Operations included metal parts machining and plating, as well as the production of batteries, electrical power devices, and solid-state components.

62.     Degreasing solvents used in these operations included TCE.

63.     As its operations moved into the 1970s, it became clear that P.R. Mallory was mishandling hazardous substances and hazardous waste at the P.R. Mallory Campus.

64.     For instance, Charles Gilkey, a former maintenance employee for P.R. Mallory, testified that he was instructed by P.R. Mallory to dump waste at the Property between 1973 to 1978.

65.     According to Mr. Gillkey, he was instructed to dispose of drums which contained waste from degreasers.

66.     Mr. Gilkey's supervisor instructed him take the drums of hazardous waste between Building L and Building O, turn the drums on their sides, open the bungs, and dump the hazardous waste onto the ground.

67.     Mr. Gillkey was then instructed to use a hose to wash the hazardous waste north along the surface of a railroad spur until the mixture of water and hazardous waste entered a sewer grate at the north end of an "alley" between Building O and Building L.

68.     Between one and three drums of hazardous waste were dumped in this manner each day until approximately 50 stored drums had all been dumped.

69.     Once the stored drums were emptied, the drums would be refilled with waste solvent and the process would be repeated at the rate of about one drum per month.

70.     This process continued until 1978.

71.     In 1978, P.R. Mallory was sold to Dart Industries and was renamed Duracell.

72.     In conjunction with that transaction, Dart spun off its electrical-contact manufacturing metallurgical division into a new corporation named Contacts Metals and Welding, Inc.

73.     Contacts Metals and Welding, Inc., was incorporated on February 17, 1978, and immediately began operating under the assumed name CMW, Inc.

74.     As part of the transaction, P.R. Mallory, now owned by Dart, divided up the P.R. Mallory Campus to allow for CMW to operate separately.

75.     The P.R. Mallory campus was divided into the Property and the remaining portion of the P.R. Mallory Campus not leased to CMW ("the P.R. Mallory Remnant").

76.     CMW leased the Property, including Buildings B, H, M, N, and O.

77.     CMW's operations at the Property continued P.R. Mallory's metallurgical division's operations and included, primarily, metals fabrication consisting of machining, press operations, metal infiltrating, electroplating, heat treating, sintering, degreasing, foundry operations, and cold rolling.

78.     CMW continued to generate the same hazardous wastes including oils, waste latex, spent solvents, spent plating waste, and spent acids.

79.     Beginning in 1978, CMW's degreasing operations began to utilize 1,1,1-trichloroethane ("1,1,1-TCA") as a primary degreasing solvent.

80.     CMW's operations and use of hazardous substances continued at the Property.

81.     For instance, during the 1980s, CMW stored various drums in temporary storage between Building O and Building L.

82.     The wastes included  latex, 1,1,1-trichloroethane still bottoms, and sodium nitrate.

83.     In 1983, CMW acquired the Property, including Buildings B, H, M, N, and O.

84.     CMW continued to use and store hazardous substances at the Property in Buildings B, H, M, N, and O, and between Building L and Building O.

85.     CMW's continued use of hazardous substances and its generation of hazardous wastes was identified by regulators as problematic.

86.     For instance, in 1986, the Indiana Department of Environmental Management ("IDEM") identified certain environmental violations by CMW related to its use of hazardous substances and its storage of hazardous wastes.

87.     Those violations included personnel lacking training, improper contingency planning to deal with an emergency, no spill control equipment, and improper storage of hazardous waste.

88.     IDEM also identified a stained area in the drum storage area between Building O and Building L.

89.     On November 19, 1987, IDEM noted a release of hazardous waste in the drum storage area between Building O and Building L.

90.     CMW ceased its storage of hazardous wastes between Building O and Building L and opted to store hazardous wastes in Building M and Building N.

91.     In 1989, one 550-gallon underground storage tank and one 1,000-gallon underground storage tank were removed from the Property.

92.     During the removal activities, a release was reported to IDEM and the presence of petroleum contaminants in soil was confirmed.

93.     During the 1990s, CMW continued its operations, including the use of hazardous substances and the generation of hazardous waste, at the Property.

94.     In 1990, CMW transitioned its degreasing solvent from 1,1,1-TCA to TCE.

95.     CMW then used TCE exclusively in its degreasers and parts washers.

96.     CMW's operations at the Property continued to be identified by regulators as problematic.

97.     In October, 1993, the Marion County Health department issued a violation letter to CMW stating that its plating shop, located in Building H, posed a risk and ordered that CMW remove and dispose of all hazardous materials.

98.     The electroplating operation was used to plate small electrical contacts with nickel, silver, cadmium, and gold.

99.     Cyanide sludge and plating solutions were the primary waste generated by this process.

100.    Later in 1993, CMW discontinued its plating operation in that portion of Building H.

101.    That portion of the building was then demolished and paved to make a parking lot.

102.    By 1999, environmental investigations began to identify further environmental issues with the Property.

103.    For instance, a 1999 Phase I identified CMW as a small quantity generator of hazardous waste and noted that, as of July 1998, CMW had been issued over 18 environmental violations.

104.    The Phase I further stated that hazardous waste continued to be stored in Building M and Building N.

105.    A particular concern in the Phase I was a drain line connecting the sewer grate to the sanitary sewer.

106.    The Phase I also noted that several regulatory records exist of spills that occurred in the dock area north of Building M and Building N where hazardous substances were transported to the Property.

107.    As of the 1999 Phase I, two types of degreasing operations were conducted at the Property: parts washing and vapor degreasing.

108.    Four parts washers were used throughout the facility: three near the center of Building O and one in the maintenance department located in Building H.

109.    These were used for cleaning small parts during the maintenance of equipment.

110.    The parts cleaners, along with the vapor degreasers, used TCE.

111.    Parts were loaded into baskets and pulled through the vapor degreasers by a conveyor.

112.    TCE was recycled through the process.

113.    Still bottoms were collected, stored in Building M and Building N, and disposed of as hazardous waste.

114.    Water from the parts cleaning process flowed into a series of three connected gravity filter settling pits located near the southeast corner of Building O.

115.    Sludges from these pits were either recycled for metal reclamation or collected and disposed of as hazardous waste.

116.    Water from one of the pits was discharged to the sewer.

117.    Virgin chemical products were stored in four locations.

118.    Drums of acid were stored on pallets in Building M and Building N; TCE drums were stored in Building H; drums of metal powders were stored on shelves in Building O; and oxygen, hydrogen, and nitrogen gasses were stored in ASTs near the southeast corner of Building O.

119.    CMW's operations and use of hazardous substance continued at the Property into the 2000s.

120.    In 2008, staining was observed on the floor of the virgin hazardous chemical product storage area in Building H, where there was no secondary containment.

121.    There was also no secondary containment in the hazardous waste storage area in the north end of Building M and Building N.

122.    Buildings H, M, and N were demolished in 2008.

123.    Despite its diminished footprint, CMW continued to operate in Buildings B and Building O and continued to use hazardous substances and generate hazardous waste.

124.    CMW continued many of the same operations, including metals fabrication consisting of machining, press operations, metal infiltrating, heat treating, sintering, degreasing, foundry operations, and cold rolling.

125.    CMW's operations at the Property continued until February 14, 2014, when it ceased operations at the Property.

126.    In 2019, five years after ceasing operations, the final two buildings on the Property, Building B and Building O, were demolished.

**II.    Battery Properties is responsible for P.R. Mallory's liabilities.**

127.    In 1978, P.R. Mallory was sold to Dart Industries, which renamed the company Duracell.

128.    In 1980, Kraft, Inc., merged with Dart Industries.

129.    In June, 1986, Dart Industries and Kraft split, with Kraft retaining the Duracell company and brand.

130.    In 1988, Kraft sold Duracell.

131.    As part of the sale, Kraft agreed to retain certain environmental liabilities arising out of certain of P.R. Mallory's operations. (the "P.R. Mallory Liabilities").

132.    When Kraft was preparing to sell Duracell, it created a subsidiary, namely, Battery Properties.

133.    Battery Properties assumed the P.R. Mallory Liabilities related to P.R. Mallory's ownership of and operations at the Property and for P.R. Mallory's ownership of and operations at the P.R. Mallory Remnant that caused contamination at the Property.

### III.    CMW International is liable for CMW's ownership of and operations at the Property.

134.    On November 1, 1999, CMW was merged with and into CMW Acquisitions, Inc.

135.    On November 21, 2008, Contacts Metals and Welding, Inc., filed articles of amendment to change its name from CMW to CMW International, Inc.

136.    On December 5, 2008, CMW International, Inc., filed a certificate of assumed name for CMW, Inc., and Contacts Metals and Welding, Inc.

137.    On December 31, 2012, CMW International, Inc., filed articles of conversion to convert from a corporation to a limited liability company.

138.    At the same time, CMW International, LLC, filed a certificate of assumed name for CMW International, Inc.

139.    CMW International is responsible for CMW's ownership of and operations at the Property.

### IV.    P.R. Mallory's and CMW's operations at the Property caused the contamination at the Property.

140.    During P.R. Mallory's ownership of and operations at the Property, P.R. Mallory purchased, used, stored, and disposed of products containing the hazardous substances discovered to be contaminating the Property.

141.    P.R. Mallory maintained chemical storage facilities that contained pits and floor drains.

142.    It operated plating, degreasing, machining, and heavy manufacturing that required the use of the hazardous substances discovered to be contaminating the Property.

143.    P.R. Mallory disposed of TCE and other chlorinated solvents by dumping barrels of it on the rail spur located near Building O and Building L.

144.    CMW continued P.R. Mallory's operations at the Property.

145.     During CMW's ownership of and operations at the Property, CMW purchased, used, stored, and disposed of products containing the hazardous substances discovered to be contaminating the Property.

146.     It operated plating, degreasing, machining, and heavy manufacturing that required the use of the hazardous substances discovered to be contaminating the Property.

**V.     P.R. Mallory's operations at the P.R. Mallory Remnant caused and contributed to the contamination at the Property.**

147.     P.R. Mallory's operations at the P.R. Mallory Remnant caused and contributed to the contamination at the Property.

148.     P.R. Mallory purchased, used, stored, and disposed of products containing the hazardous substances discovered at the P.R. Mallory Campus, including at the P.R. Mallory Remnant.

149.     It operated plating, degreasing, machining, wet laboratories, and heavy manufacturing that required the use of the hazardous substances.

150.     It maintained chemical storage facilities that contained pits and floor drains in a number of its buildings at the P.R. Mallory Remnant.

151.     Contamination at the P.R. Mallory Campus, including the P.R. Mallory Remnant, is contributing to the contamination at the Property.

**VI.     CMW International and Battery Properties are liable to Graymor Properties.**

152.     Since the contamination was discovered, Graymor Properties has incurred, and will continue to incur, environmental response costs in responding to the contamination including costs necessary to remove and remediate the contamination.

153.     Graymor Properties, by this action, seeks recovery of its past and future environmental response costs incurred as a result of P.R. Mallory's and CMW's contamination of

the Property and P.R. Mallory's contamination of the P.R. Mallory Remnant, including Graymor

Properties' attorneys' fees and court costs incurred in bringing this action.

154.    Battery Properties and CMW International are respectively liable for P.R.

Mallory's and CMW's contamination of the Property.

## CLAIMS FOR RELIEF

### Count I
### Indiana Environmental Legal Action

155.    Graymor Properties incorporates by reference paragraphs 1 through 154 above as

though fully set forth herein.

156.    Section 13-30-9-2 of the Indiana's Environmental Legal Action Statute (the

"ELA") reads as follows:

> A person may, regardless of whether the person caused or contributed to the
> release of a hazardous substance or petroleum into the surface or subsurface
> soil or groundwater that poses a risk to human health and the environment,
> bring an environmental legal action against a person that caused or
> contributed to the release to recover reasonable costs of a removal or
> remedial action involving the hazardous substances or petroleum.

157.    Graymor Properties, Battery Properties, and CMW International are "persons"

within the meaning of the ELA.

158.    Battery Properties and CMW International caused and contributed to the release of

hazardous substances into the subsurface soil and groundwater at and around the Property.

159.    The subsurface soil and groundwater contamination at and around the Property

poses a risk to human health and the environment.

160.    Through the work conducted at and around the Property by and on behalf of

Graymor Properties, Graymor Properties has incurred and will continue to incur environmental

response costs associated with Battery Properties' and CMW International's contamination of the Property.

161.     Battery Properties and CMW International are liable to Graymor Properties for all costs Graymor Properties has incurred and will incur as a result of the contamination at and around the Property, as well as the attorneys' fees and court costs incurred by Graymor Properties in bringing this action.

## Count II
## Comprehensive Environmental Response, Compensation, and Liability Act

162.     Graymor Properties incorporates by reference paragraphs 1 through 161 above as though fully set forth herein.

163.     42 U.S.C. § 9607(a)(4)(B) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), reads as follows:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—
>
> (1)   the owner and operator of a vessel or a facility,
>
> (2)   any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
> (3)   any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other part or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
>
> (4)   any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

      (A)   all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

      (B)   any other necessary costs of response incurred by any other person consistent with the national contingency plan (…)

164.     42 U.S.C. § 9601(9) reads as follows: "The term 'facility' means (A) any building, structure, installation, equipment, pipe or pipeline … or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located."

165.     40 CFR § 304.12 (m) reads as follows: "Potentially responsible party or PRP means any person who may be liable pursuant to section 107(a) of CERCLA, 42 U.S.C. 9607(a), for response costs incurred and to be incurred … not inconsistent with NCP."

166.     The Property which is the subject of this action is a "facility" as defined under CERCLA.

167.     Battery Properties and CMW International caused and contributed to the release of hazardous substances into the subsurface soil and groundwater at and around the Property and are each a Potentially Responsible Party as defined in 40 CFR § 304.12(m).

168.     Battery Properties and CMW International were owners of the Property at a time of the disposal of hazardous substances at the Property and are each a Potentially Responsible Party as defined in 40 CFR § 304.12(m).

169.     Through the work conducted at and around the Property by and on behalf of Graymor Properties, Graymor Properties has incurred and will continue to incur environmental remediation and response costs that are consistent with the National Contingency Plan.

170.     Battery Properties and CMW International are jointly and severally liable to Graymor Properties for all costs Graymor Properties has incurred and will incur as a result of the contamination at and around the Property.

## Count III
## Negligence

171.    Graymor Properties incorporates by reference paragraphs 1 through 170 above as though fully set forth herein.

172.    Battery Properties and CMW International each had a duty to not allow hazardous substances to be released into the environment and to promptly respond to any release of such hazardous substances in a manner that would remove the dangers created by the release of the hazardous substances.

173.    Battery Properties and CMW International each breached these duties by their negligent acts and omissions in operating and maintaining the Property, by their failure to implement safeguards to assure against the release of hazardous substances, and by their failure to promptly and effectively address their release of hazardous substances.

174.    Battery Properties and CMW International each knew or should have known that the release of hazardous substances had the potential to cause harm to human health and the environment.

175.    As a direct and proximate result of Battery Properties' and CMW International's breaches of their duties, Graymor Properties has suffered and continues to suffer damages.

176.    Battery Properties and CMW International are liable to Graymor Properties for all costs Graymor Properties has incurred and will incur as a result of the contamination at and around the Property.

**Count IV**
**Negligence Per Se**

177.     Graymor Properties incorporates by reference paragraphs 1 through 176 above as though fully set forth herein.

178.     The release of hazardous substances at the Property by Battery Properties and CMW International, and Battery Properties' and CMW International's failure to properly address their release of hazardous substances at the Property, constitute an unexcused and unjustified violation of a duty prescribed by statute, regulation, or ordinance including, but not limited to, a violation of the ELA, CERCLA, and the Resource Conservation and Recovery Act, 42 U.S.C. 6901 *et seq*.

179.     The breaches by Battery Properties and CMW International of duties prescribed by statute, regulation, and ordinance are the proximate cause of injury to Graymor Properties.

180.     The violations of, but not limited to, the above-referenced statutes impose liability upon Battery Properties and CMW International.

181.     Battery Properties and CMW International are liable to Graymor Properties for all costs Graymor Properties has incurred and will incur as a result of the contamination at and around the Property.

**PRAYER FOR RELIEF**

WHEREFORE, Graymor Properties respectfully requests that the Court:

1.     Enter judgment in favor of Graymor Properties and against Battery Properties and CMW International;

2.     Order Battery Properties and CMW International to pay Graymor Properties an amount that will fully and fairly compensate Graymor Properties for its past and prospective damages;

3.      Order Battery Properties and CMW International to pay Graymor Properties for its

reasonable attorneys' fees and court costs incurred in bringing this action;

4.      Declare that Battery Properties and CMW International are obligated to pay all

costs, damages, fees, and other expenses incurred and to be incurred by Graymor

Properties arising from the environmental contamination at the Property;

5.      Award Graymor Properties all further relief that is just and proper including

prejudgment interest at Indiana's statutory rate of eight percent on all covered, but

unreimbursed, past costs.

## JURY DEMAND

Graymor Properties, pursuant to Federal Rule of Civil Procedure 38(b), respectfully

submits this demand for trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Matthew T. Albaugh*
Matthew T. Albaugh, Atty. No. 23293-49
William P. Sweet Atty. No. 36086-49
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204-2023
Telephone: (317) 713-3500
Email: malbaugh@taftlaw.com
        wsweet@taftlaw.com

*Counsel for Plaintiff*

90188800