UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| GRAYMOR PROPERTIES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-00754-SEB-TAB |
| | ) | |
| BATTERY PROPERTIES, INC., | ) | |
| CMW INTERNATIONAL, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| BATTERY PROPERTIES, INC., | ) | |
| CMW INTERNATIONAL, LLC, | ) | |
| | ) | |
| Counter Claimants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GRAYMOR PROPERTIES LLC, | ) | |
| GRAYMOR PROPERTIES LLC, | ) | |
| | ) | |
| Counter Defendants. | ) | |

**ORDER ON PARTIES' CROSS-MOTIONS FOR PARTIAL SUMMARY
JUDGMENT**

This complex environmental cleanup litigation arises out of ongoing and contested

efforts to decontaminate real property underlying a former industrial plant located in Indi-

anapolis, Indiana (hereinafter, the "Site"). For the better part of a century, the Site's several,

successive owners and operators conducted an array of manufacturing operations entailing

the use and disposal of hazardous chemicals that continue to contaminate the Site's soil and

1

groundwater. Recent investigations reveal that vapors emitting from the Site have begun encroaching on the properties of a neighboring school and residential homes.

The Site's current owner, Plaintiff/Counter Defendant Graymor Properties LLC ("Graymor") brought this civil action against Defendant/Counter Claimant Battery Properties, Inc. ("Battery Properties") and Defendant/Counter Claimant CMW International, LLC ("CMW") to recover certain cleanup costs, pursuant to Indiana's Environmental Legal Action ("ELA") Statute, Ind. Code § 13-30-9-2, the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607, and Indiana common law. Battery Properties is the legal successor to environmental liabilities incurred by the Site's original owner, P.R. Mallory & Company ("P.R. Mallory"), and CMW is a prior owner of the Site. Battery Properties and CMW, respectively, have each responded by filing contribution counterclaims, pursuant to § 113(f) of the CERCLA, codified at 42 U.S.C. § 9613(f)(1), and CMW has also interposed a breach-of-contract counterclaim against Graymor.

Now before the Court are the following motions: Battery Properties's Motion for Partial Summary Judgment on Graymor's state-law claims, dkt. 126; Graymor's Motion for Partial Summary Judgment on its CERCLA and ELA claims as well as on CMW's breach-of-contract counterclaim, dkt. 129; and CMW's Motion for Partial Summary Judgment on Graymor's state common law claims, dkt. 130. For the reasons discussed below, Battery Properties's motion is **GRANTED in part** and **DENIED in part**, dkt. 126; Graymor's motion is **GRANTED in part** and **DENIED in part**, dkt. 129; and CMW's motion is **GRANTED**, dkt. 130.

## LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because summary judgment requires "no *genuine* issue of *material* fact," "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247−48 (1986) (emphasis in original). Material facts are those that "might affect the outcome of the suit," and a dispute of material fact is genuine when "a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

"The ordinary standards for summary judgment remain unchanged on cross-motions for summary judgment: we construe all facts and inferences arising from them in favor of the party against whom the motion under consideration is made." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017) (citation omitted). Where the movant seeks "summary judgment on a claim as to which it bears the burden of proof, it must lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so-one sided as to rule out the prospect of finding" in the nonmovant's favor. *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015). "If the movant has failed to make this initial showing, the court is obligated to deny the motion." *Id.*

## BACKGROUND

### I.    Preliminary Evidentiary Issues

#### A.    Graymor's Summary Judgment Exhibits

Before addressing the merits, we digress to address the deficient and frustrating manner in which Graymor filed its summary judgment exhibits. Due to "the high volume of summary judgment motions and the benefits of clear presentation of relevant evidence and law, [the Seventh Circuit has] repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote clarity of summary judgment filings." *Stevo v. Frasor*, 662 F.3d 880, 886–87 (7th Cir. 2011). As relevant here, our Local Rules provide that "[e]ach electronically filed exhibit to a main document must be: (1) created as a *separate* PDF file; (2) submitted *as an attachment* to the main document and given a title which describes its content; and (3) limited to excerpts that are directly germane to the main document's subject matter." S.D. Ind. L. R. 5-6(a) (emphasis added). At the summary judgment stage, parties' evidentiary citations "must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." S.D. Ind. L.R. 56-1(e). Failure to comply with these procedures greatly hinders our ability to locate and review each exhibit that has been submitted into the record and cited in the parties' briefs. This difficulty is especially critical on summary judgment, given that the court has no duty to scour the record in search of evidence that has not been properly submitted or cited by the parties. *See* S.D. Ind. L.R. 56-1(h).

Here, Graymor has given short shrift to these responsibilities. For example, Graymor's summary judgment materials include *twenty-two* unconsolidated exhibits, meaning

that each exhibit appears as a separate docket entry, *see generally* dkt. 134–55, rather than as an attachment to a main document, *see* S.D. Ind. L.R. 5-6(a). What's more, some of Graymor's exhibits are comprised of more than a dozen smaller exhibits, in clear contravention of our Local Rule requiring that electronically filed exhibits be organized as *separate* PDF files. *Id.* For example, "Exhibit 1" is a 1,351-page combined PDF that includes a deposition transcript and more than forty individual exhibits. Dkt. 134; *e.g.*, dkt. 138 ("Exhibit 5" comprising of 205 pages); dkt. 141 ("Exhibit 8" comprising of 586 pages).

Graymor's citations to record evidence further exacerbate the difficulties we faced in locating materials cited by the parties. For example, Graymor cites to "BPI Dep. Ex. 14." Dkt. 133 at 3. "BPI Dep." appears on our docket as "Exhibit 1," though without a proper title to indicate its contents. Dkt. 134. *But see* S.D. Ind. L.R. 5-6(a)(2). As noted above, Exhibit 1 contains more than *1,350* pages, only the first sixty-five of which consist of the relevant deposition testimony, dkt. 134 at 1–65; the remaining pages include more than three dozen, non-searchable exhibits to the deposition, including "Ex. 14." The generic labels given to these exhibits, coupled with their volume and Graymor's failure to describe their contents and/or to accurately specify where they can be found in the record, have made our already challenging task on summary judgment even more difficult.

Despite our best efforts to examine carefully the evidentiary record and cull the material facts, we ultimately must rely upon the parties in a litigation "to identify with reasonable particularity the evidence" that either merits or "precludes summary judgment." *Brasic v. Heinemann's Inc.*, 121 F.3d 281, 285 (7th Cir. 1997). Where Graymor's presentation of the facts has fallen short of these standards, we have foregone the effort to expend our

limited judicial resources "scour[ing] the record" in an effort to piece together Graymor's case. *Id.*; *see, e.g.*, S.D. Ind. L.R. 56-1(h) & cmt. (e).

### B.    Battery Properties's Evidentiary Objection

Battery Properties objects to Graymor's reliance upon the deposition testimony of Charles Gilkey ("Mr. Gilkey"), dkt. 188-1,[1] a former P.R. Mallory and CMW employee whose deposition was taken on December 5, 1990, pursuant to a petition to perpetuate testimony. *See In re Petition of CMW, Inc., for Perpetuation of Testimony*, No. 49D059010 M11580 (Marion Sup. Ct. filed on Oct. 17, 1990); dkt. 188-1 at 1. Graymor has relied on Mr. Gilkey's testimony to establish that Battery Properties (as P.R. Mallory's successor) and CMW are "responsible person[s]" under CERCLA, which satisfies one essential element of Graymor's § 107(a) claim against them. Dkt. 133 at 12–13. That said, no Defendant has sought or opposed summary judgment on the basis of whether it qualifies as a "responsible person" under CERCLA. Because Mr. Gilkey's testimony is not otherwise relevant to the issues presented in the parties' cross-motions for partial summary judgment, we need not resolve Battery Properties's objection at this time. (We recognize, however, that Graymor has since moved for a pretrial ruling on the admissibility of Mr. Gilkey's deposition testimony. Dkt. 188. That motion remains pending and will be decided in due course.)

---

[1] In its summary judgment reply brief, Graymor repeatedly cites to Mr. Gilkey's deposition testimony at "Dkt. 134 at 6." Dkt. 169 at 3–4. Unfortunately, our review of "Dkt. 134 at 6" did not yield the transcript of Mr. Gilkey's deposition, or, for that matter, any other potentially relevant evidence. Graymor's more recent, albeit unrelated, filings properly designated Mr. Gilkey's deposition transcript, thus facilitating our ability to locate and review his testimony. Dkt. 188.

## II.      The Site's Ownership & Operational History

With some minor caveats not relevant to the instant motions, the Site's ownership and operational history is undisputed by the parties. In 1929, Battery Properties's predecessor, P.R. Mallory, acquired real property along East Washington Street in Indianapolis to serve as the new locus of its budding manufacturing enterprise. Bonisoli Dep. 136:8–14, dkt. 128-1 (deposition transcript of Battery Properties's 30(b)(6) witness, Jason Bonisoli). As P.R. Mallory's operations expanded, so, too, did the geographical parameters of the industrial compound: Over the course of the ensuing decades, P.R. Mallory purchased adjacent parcels of land where new facilities were erected to accommodate the company's evolving and expanding manufacturing operations. *See, e.g.*, *id.* at 31:4–7; dkt. 135 (map of the P.R. Mallory campus and its contiguous properties). The Site at the center of this environmental controversy comprises 5.5 acres within the former P.R. Mallory campus located at 70 (a/k/a 55) South Gray Street. Dkt. 132-2 at 1; Bonisoli Dep. 22:19–22, dkt. 128-1.

For approximately fifty years, between the late 1920s and 1978, P.R. Mallory manufactured an array of electrical support parts, such as radio components, bearings, batteries, power transistors, variable inductance tuners, and metal alloys, dkt. 142 at 5–7; dkt. 137 at 7, which processes entailed the use of degreasers and other chemical solvents. *See* Mundell R. 33, dkt. 125-1 at 36. P.R. Mallory's operations at the Site ceased in 1978, when CMW (then operating as "CMW, Inc.") "made a select asset purchase" from P.R. Mallory's Metallurgical Division and began leasing the Site. Johnston Dep. 31:12–21, dkt. 139 at 10 (deposition transcript of Howard Johnston); Bonisoli Dep. 236:12–24, dkt. 128-1.

7

CMW officially acquired title to the Site in 1983 and thereafter continued its manufacturing operations for thirty years, until early 2014. Henshaw Dep. 46:2–12, dkt. 132-3 at 13 (deposition testimony of CMW's 30(b)(6) witness, Stephen R. Henshaw); Bonisoli Dep. 122:22–23, dkt. 128-1; dkt. 137 at 4; dkt. 128-28 at 1 (noting that CMW entered receivership in early 2014). CMW produced component parts such as silver alloy wire, strips, rotors, heat sinks, contacts, and welding tips. Dkt. 137 at 9. The manufacturing processes associated with these operations included machining, metal infiltering, electroplating, foundry, and degreasing, among others. *Id.*

Approximately ten years after going into receivership, on February 3, 2023, CMW sold the Site to Graymor, the current owner, who sought to utilize the property for truck and trailer storage. Litwack Dep. 19:6–25, dkt. 132-1 at 63 (deposition testimony of Reid Litwack, Graymor's 30(b)(6) witness). No manufacturing operations have been conducted at the Site since early 2014.

No one in this litigation disputes that P.R. Mallory's and CMW's manufacturing activities resulted in environmental degradation of the soil, groundwater, and soil vapors at and near the Site. Dkt. 127 at 2; dkt. 133 at 3–9; dkt. 164 at 3. Likewise, the parties concede that the presence of chlorinated volatile organic compounds ("CVOCs")—trichloroethylene ("TCE"), predominantly, though other CVOCs and hazardous chemicals have also been detected—is driving the current need for environmental response action, since CVOCs have been found to exist in the greatest quantities and pose actual and imminent risks to human health and the environment. *See, e.g.*, Mundell R. 29, 31, dkt. 125-1 at 32, 34; Herman R. 51, dkt. 122-1 at 59.

### III.    Battery Properties's Participation in Indiana's Voluntary Remediation Program

In January 2000, Battery Properties applied to participate in Indiana's Voluntary Remediation Program ("VRP"), dkt. 128-6, a state-run program that encourages past and/or present property owners to voluntarily address environmental contaminants posing risks to human health and the environment. *See* Ind. Code § 13-25-5 *et seq.* The Indiana Department of Environmental Management ("IDEM"), which oversees the administration of the VRP, granted Battery Properties's application a month later, in February 2000. Dkt. 128-7 (IDEM's approval letter for VRP #6000101).

Later that year, in November 2000, Battery Properties and IDEM proceeded to compliance with the next step of Indiana's VRP: executing a Voluntary Remediation Agreement ("VRA"). The 2000 VRA required, *inter alia*, that Battery Properties submit a Remediation Work Plan ("RWP") within 180 days "or longer if an extension [wa]s agreed to by the parties." Dkt. 128-8 at 6 (the "2000 VRA"). If, however, Battery Properties "fail[ed] to submit the Work Plan within that period[,] the Agreement [wa]s voidable at the discretion of IDEM." *Id.* Graymor and Battery Properties agree (and CMW does not dispute) that the hazardous substances encompassed by the VRP application and subsequent VRA include a host of CVOCs, semivolatile organic compounds ("SVOCs"), polychlorinated biphenyls ("PCBs"), and metals. Dkt. 126-6 at 27; *see* dkt. 163 at 7; dkt. 167 at 4.

In September 2000, two months *prior* to the execution of the 2000 VRA, Battery Properties submitted for IDEM's review an Investigation Work Plan ("IWP") detailing additional investigations into "the soil in the vicinity of the former drum storage area and . .

9

. the groundwater beneath the Site." Dkt. 128-9 at 1. (The 2000 VRA also provided Battery Properties the option of preparing and submitting an IWP. *See* dkt. 128-8 at 5–6). IDEM approved Battery Properties's IWP in March 2001, and data collection activities began at the Site shortly thereafter and continued through mid-2003. *See* dkt. 128-10 (January 2002 Phase II Investigation Report (Revision No. 1)); dkt. 128-11 (July 2003 Phase II Investigation Report (Revision No. 2)).

On December 5, 2003, Battery Properties submitted a Remediation Work Plan proposal for IDEM's review and approval. Dkt. 128-4. (Since Battery Properties's submission consists only of the cover page of its 2003 RWP proposal, the scope of work encompassed therein remains unknown. *See id.*) Eighteen months thereafter, on August 10, 2005, IDEM issued a technical approval of Battery Properties's proposal, explaining that "according to statute, the IDEM must make this [RWP proposal] available for public comment" before "a final RWP approval letter w[ould] be issued by the Commissioner." Dkt. 128-12 at 1 (IDEM's Technical Approval); *see also* Ind. Code § 13-25-5-11 (mandating thirty-day notice and comment period). The record does not disclose precisely the date when IDEM issued a final approval, though subsequent correspondence with IDEM does reveal that, from October through December 2005, Battery Properties installed and developed groundwater monitoring wells at the Site, collected soil and groundwater samples, and reported its findings to IDEM. *See, e.g.*, dkt. 128-13 (October 2005 notice of upcoming "IDEM-approved" work); dkt. 128-14 (November 2005 memorandum of analytical results); dkt. 128-15 (December 2005 memorandum of analytical results).

From 2006 through 2009, Battery Properties conducted multiple phases of ground-
water and soil investigations in order to delineate the impacts on site and downgradient of
the drum storage area, notifying IDEM of its progress at various steps. Dkt. 128-16 (Janu-
ary 2006 notice of quarterly groundwater sampling); dkt. 128-17 (May 2006 notice of quar-
terly groundwater sampling). In July 2007, Battery Properties sought IDEM's approval to
collect additional groundwater confirmation samples from the Site, which request was
granted by IDEM in March 2008. Dkt. 128-18 (July 2007 request); dkt. 128-19 (March
2008 approval); dkt. 128-20 (November 2008 summary of groundwater investigation ac-
tivities).[2] Investigatory efforts continued through 2009 with Battery Properties conducting
additional ongoing groundwater investigations. Dkt. 128-21 (August 2009 summary of
March 2009 supplemental groundwater investigations); dkt. 128-22 (December 2009 sum-
mary of October 2009 supplemental groundwater testing). In December 2009, at IDEM's
request, Battery Properties again supplemented its groundwater sampling activities in order
"to obtain baseline groundwater analytical data from the recently installed deep monitoring
wells and [to] evaluate groundwater flow in the deep groundwater unit." Dkt. 128-23 at 1.
Battery Properties's findings were transmitted to IDEM in February 2010. *Id.*

In May 2010, Battery Properties provided detailed responses to several comments
from IDEM apropos of the ongoing investigations and agreed to reassess the Site's concep-
tual model and to identify "potentially completed exposure pathways." Dkt. 128-24 at 3–

---

[2] The cited correspondence contains several unexplained references to Battery Properties *and*
CMW having "jointly entered into" the VRP. *See, e.g.*, dkt. 128-20 at 1; dkt. 128-18 at 1. Whether
or to what extent CMW has participated in the VRP has not been explained to us, however.

4. Battery Properties's groundwater testing operations continued through 2012, as reflected in its correspondence with IDEM. *See, e.g.*, dkt. 128-25 (September 2011 Supplemental Investigation Work Plan); dkt. 128-26 (March 2012 Response to Comments & Supplemental Groundwater Investigation Summary); dkt. 128-27 (October 2012 Response to Comments & Supplemental Investigation Work Plan).

In mid-2014, after CMW's manufacturing operations had ceased, Battery Properties performed a "focused subsurface investigation" and discovered "highly elevated concentrations of TCE . . . extending from near surface to depth . . . in the soil samples obtained from the area of the Building A Western Degreaser operated by CMW." Dkt. 128-28 at 4; *e.g.,* dkt. 165-2 (October 2024 letter from IDEM noting that "TCE appeared to be the most prevalent release related chemical detected at the source areas (i.e. former drum storage areas, former degreaser areas, and plating areas)"). In September 2014, IDEM issued a Special Notice of Liability to CMW and the Site's then-current owner, non-party Evergreen Holdings, demanding information pertaining to the "generation, storage, disposal, and handling methods . . . for [certain specified] hazardous substances and petroleum" as well as any "activities and parties that contributed to contamination at the Site." Dkt. 128-29 at 2.

It is not clear what cleanup-related efforts were pursued and/or accomplished between 2013 and 2025, since neither the parties nor the record before us details the events from that period.[3] That said, in February 2025, Battery Properties completed an RWP

---

[3] Battery Properties broadly references "additional work" that was undertaken between 2015 and 2025 but has failed to support this averment with record evidence. Dkt. 127 at 5 (citing dkt. 128-5, which is a one-page cover sheet).

proposal, which IDEM technically approved in June 2025. Dkt. 128-31. During the statutory comment period, Battery Properties received comments only from CMW. Dkt. 128-32. (In October 2025, after the parties completed their summary judgment briefing, IDEM issued its final approval to Battery Properties re: the February 2025 RWP. Dkt. 173-3.)

## IV.    CMW's Cleanup Efforts

The nature and extent of CMW's cleanup efforts have not been clearly set forth by the parties in their court filings, since those issues are not directly material to the pending cross-motions. An October 31, 2024, letter from IDEM to CMW does reveal, however, that CMW has proposed an Interim Remediation Work Plan ("Interim RWP") prioritizing the remediation of CVOC impacts on the soil and groundwater as well as the mitigation of vapors emanating from the sewers. Dkt. 165-2 at 1, 3, 11. IDEM's correspondence also reflects that "site access to CMW is now being denied by the current owner," Graymor, which "only adds to the ongoing uncertainty and progress going forward of implementing a viable remedy at the [Site]." *Id.* at 3.

## V.    Graymor's February 2023 Acquisition of & Involvement at the Site

Before purchasing the Site, Graymor, through its (non-party) environmental consultant EnviroForensics LLC ("EFI"), completed a pre-purchase Phase I Environmental Site Assessment. Litwack Dep. 25:12–13, 40:14–18, dkt. 128-3. EFI's Phase I report, dated January 27, 2023, recounted the Site's known contaminants (e.g., CVOCs, SVOCs, PCBs, and metals) as well as IDEM's continued involvement in ongoing cleanup and remediation efforts. Dkt. 132-4 at 6–8. The Phase I report also indicated the "potential" presence of per- and polyfluoroalkyl substances ("PFAS"), an "emerging contaminant of concern due to

13

recent scientific studies indicating exposure to PFAS may be linked to harmful health ef-
fects in humans and animals." *Id.* at 9–10.

Aware of the Site's contamination by "harmful chemicals," Litwack Dep. 37:1–11,
38:22–25, dkt. 128-3, Graymor purchased the Site "as is" and "where is" on February 3,
2023, as documented in Purchase Agreement to which Graymor and CMW are parties, dkt
132-2 at 8 (Purchase Agreement). Graymor paid $600,000 for the property, anticipating
that cleanup efforts might cost "around a million bucks." Litwack Dep. 98:21–22, 95:11–
20, dkt. 128-3. According to Graymor's expert witness, Kurt Herman, "Graymor has used
its own funds to secure, investigate and develop a remediation work plan for contamination
at the Site." Herman R. 77, dkt. 122-1 at 85. Graymor has not quantified these alleged
expenditures, however.

On December 10, 2024, IDEM technically approved Graymor's "Data Gap Site In-
vestigation" work plan, pursuant to which EFI would continue to assess the potential im-
pact of PFAS in the soil and groundwater at the Site. Dkt. 155 at 3. Following the comple-
tion of supplemental investigations, IDEM requested that Graymor develop and present a
comprehensive remediation plan in a timely fashion so that IDEM could appropriately co-
ordinate each party's respective "remedy implementation timetable." *Id.* at 5.

## VI.    This Litigation

On May 3, 2023, Graymor filed this lawsuit[4] against Battery Properties and CMW,
asserting claims against both Defendants, pursuant to the ELA, CERCLA, and Indiana

---

[4] This litigation is the sequel to four prior lawsuits, though none directly impacts the claims pend-
ing before us. *CMW Int'l, LLC v. Amerisure Ins. Co.*, No. 1:16-cv-01384-TWP-TAB (S.D. Ind.

common law, and seeking to recover "costs incurred and to be incurred . . . in responding to the release of hazardous substances at the [Site] that pose a risk to human health and the environment." Compl. ¶ 10, dkt. 1. Graymor avers that Battery Properties's and CMW's former operations at the Site caused and contributed to the release of hazardous substances into the Site's soil and groundwater. Accordingly, Graymor maintains, Battery Properties and CMW are jointly and severally liable to it for all past and future remediation costs.

Battery Properties and CMW deny that they are liable to Graymor for cleanup costs. Battery Properties contends that it is immune from Graymor's ELA claim, since Indiana law confers VRP participants, like Battery Properties, with legal protections against such claims. Both Battery Properties and CMW assert contribution counterclaims against Graymor, pursuant to § 113(g) of the CERCLA. Battery Props.'s Answer & Countercl. ¶¶ 1–13, dkt. 27 at 35–36; CMW's Answer & Countercl. ¶¶ 1–13, dkt. 49 at 38–39. In a second counterclaim, CMW alleges that Graymor breached the terms of the February 2023 Purchase Agreement by initiating this lawsuit. CMW's Answer & Countercl. ¶¶ 14–25, dkt. 49 at 39–41.

On August 4, 2025, the parties cross-moved for partial summary judgment: Battery Properties seeks summary judgment on Graymor's state-law claims, dkt. 126; Graymor seeks summary judgment on its CERCLA and ELA claims as well as on CMW's breach-

---

filed on Jun. 6, 2016) (CMW's insurance coverage); *Battery Properties, Inc. v. CMW Int'l, LLC and Evergreen Holdings Int'l, LLC*, No. 49D02-1706-PL-022673 (Marion Sup. Ct. filed on Jun. 7, 2017) (re: responsibility for contamination); *Wausau Underwriters Ins. Co. v. CMW Int'l, LLC et al*, No. 1:19-cv04564-JPH-MPB (S.D. Ind. filed on Nov. 14, 2019) (dispute between CMW and its insurers over selection of an environmental consultant).

of-contract counterclaim, dkt. 129; and CMW seeks summary judgment on Graymor's common law negligence claims, dkt. 130. These motions are now fully briefed and ripe for ruling.

Two other motions remain pending: Battery Properties's Motion to Exclude Expert Opinions of Lawrence P. Schnapf ("Mr. Schnapf"), Graymor's expert witness, dkt. 156, filed on August 11, 2025; and Graymor's Motion for Preliminary Injunction, dkt. 173, filed on November 6, 2025. Because Graymor does not rely upon Mr. Schnapf's testimony in seeking (or opposing) the entry of summary judgment, we shall undertake and resolve Battery Properties's Motion to Exclude at a later time. *See Kansas City S. Ry. Co. v. Sny Island Levee Drainage Dist.*, 831 F.3d 892, 900 (7th Cir. 2016) ("Where a trial judge conducts a bench trial, the judge need not conduct a *Daubert* (or Rule 702) analysis before presentation of the evidence, even though [s]he must determine admissibility at some point.").

Likewise, having reviewed Graymor's motion for a preliminary injunction and Defendants' responses in opposition, *see* dkt. 173, 176–77, 180–81, we conclude that consolidating our resolution of Graymor's motion with the upcoming trial on the merits will ensure an orderly disposition of the case, while ensuring that the parties are afforded "a full and fair opportunity to present their respective cases." *Am. Train Dispatchers Dep't of Int'l Bhd. of Locomotive Eng'rs v. Fort Smith R. Co.*, 121 F.3d 267, 270 (7th Cir. 1997); *See also* Fed. R. Civ. P. 65(a)(2).

## LEGAL DISCUSSION

We address the parties' cross-motions for summary judgment in the context of the various claims and counterclaims advanced herein.

I.    **Battery Properties's and CMW's Motions for Summary Judgment as to Graymor's Negligence & Negligence *Per Se* Claims**

Battery Properties and CMW, respectively, seek summary judgment on Graymor's negligence and negligence *per se* claims. Dkt. 126; dkt. 130. In a footnote embedded within its September 2, 2025, response in opposition to Battery Properties's motion, Graymor purports to "voluntarily dismiss[ ] its claims . . . for negligence and negligence *per se*, without prejudice." Dkt. 163 at 12 n.2. Defendants object to Graymor's dismissal without prejudice as improper, untimely, and inadequate to defeat their motions for summary judgment. Dkt. 167 at 7–8; dkt. 168 at 1–2. Accordingly, Defendants request either the entry of summary judgment in their favor or the dismissal *with* prejudice of Graymor's negligence claims. Dkt. 167 at 7–8; dkt. 168 at 3. (Notably, the parties' most recent case management plan, which was jointly filed on October 1, 2025, reflects an apparent agreement among the parties that "Graymor [has] dismissed its common law claims for negligence and negligence *per se*," dkt. 170 at 2, though they do not indicate whether such dismissal is with or without prejudice.)

We agree with Defendants that dismissal without prejudice of Graymor's common law negligence claims, especially at this stage of this litigation, is neither warranted nor appropriate. Insofar as the Federal Rules of Civil Procedure might otherwise permit Graymor to seek a dismissal without prejudice, *see* Fed. R. Civ. P. 41(a), Graymor's failure to invoke the relevant legal authority and to develop any persuasive argument as to the propriety of a prejudice-free dismissal constitutes waiver. *United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000) ("[P]erfunctory and undeveloped arguments, and arguments that

are unsupported by pertinent authority, are waived."). Because Graymor has also failed to adduce *any* facts or argument relating to the viability of its negligence and negligence *per se* claims, Battery Properties's and CMW's motions for summary judgment on Graymor's negligence and negligence *per se* claims shall be **granted**. *See Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003) (explaining that, to defeat summary judgment motion, nonmovant must adduce specific facts "sufficient to raise a genuine issue for trial").

## II. Graymor's Motion for Summary Judgment as to Battery Properties's & CMW's Liability under § 107(a) of CERCLA

Congress enacted CERCLA in 1980 to "promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009). CERCLA "operates in part by encouraging, and directly providing the vehicle for, private parties to invest in environmental response, including remediation, and then to recover at least part of those response costs from other potentially responsible parties or PRPs." *Von Duprin LLC v. Major Holdings, LLC*, 12 F.4th 751, 758 (7th Cir. 2021). PRPs include "current owners and operators of a site that experienced a disposal of hazardous material, past owners or operators at the time of the release, persons who arranged for disposal of a hazardous substance at a site, and parties who transported a hazardous substance to a site." *Id.* (citing 42 U.S.C. § 9607(a)(1)–(4)).

Section 107(a), codified at 42 U.S.C. § 9607(a), "provides PRPs who incurred response costs with a cause of action to recover certain of those costs from other PRPs." *Id.*

(citing *United States v. Atl. Rsch. Corp.*, 551 U.S. 128, 131 (2007)). "PRPs who find themselves sued under § 107(a) often file a counterclaim against the original plaintiff on the basis that the party is itself a PRP" who bears legal responsibility to "contribute to any ultimate remediation liability." *Id.* "These so-called contribution counterclaims proceed under § 113(f) of CERCLA, which authorizes the allocation of liability based on 'such equitable factors as the court determines are appropriate.' " *Id.* (quoting 42 U.S.C. § 9613(f)(1)). CERCLA also provides a "bona fide prospective purchaser" (or "BFPP") "affirmative defense to remediation liability to PRPs who did not release hazardous materials themselves but remain potentially liable by virtue of being a current owner of a site where a prior release occurred." *Id.* at 759 (citing 42 U.S.C. § 9607(q)(1)(C)).

In this litigation, Graymor seeks to recoup past and future cleanup costs from Battery Properties and CMW, pursuant to § 107(a). Battery Properties and CMW each respond by denying liability to Graymor and asserting contribution counterclaims under § 113(f). Graymor invokes the BFPP defense to Battery Properties's and CMW's § 113(f) counterclaims. Dkt. 40, 52.

Graymor's motion for partial summary judgment seeks a finding that: (1) Battery Properties and CMW are liable to Graymor under § 107(a) of CERCLA; (2) Graymor is entitled to recover its past costs from Battery Properties and CMW; and (3) Graymor is entitled to recover its future costs and damages, including interest and attorneys' fees and costs, as well as all other appropriate relief. Because only Graymor has moved for summary judgment on the § 107(a) claim, we shall construe all disputed facts in the light most favorable to Battery Properties and CMW as the nonmovants. *Anderson*, 477 U.S. at 255.

To prevail on a § 107(a) cost recovery claim, a non-governmental "plaintiff must show that (1) the site in question is a 'facility'; (2) the defendant qualifies as a PRP; (3) the facility experienced the release or threatened release of hazardous substances; and (4) the plaintiff incurred costs consistent with the National Contingency Plan in responding to the release." *Von Duprin*, 12 F.4th at 758. Neither Battery Properties nor CMW contests the first three elements. Rather, they argue that Graymor cannot satisfy the final element because it has not incurred costs that are necessary and/or consistent with the National Contingency Plan ("NCP"). Battery Properties also argues that the § 113(f) contribution counterclaims preclude a ruling that responsibility for Site response costs lies exclusively with Defendants, given that Graymor is also an alleged PRP and has failed to prove that it qualifies as a BFPP (though no party has sought summary judgment on the § 113(f) counterclaims or Graymor's BFPP defense).

## A.    Impact of Defendants' § 113(f) Counterclaims

"[S]ection 113(f) creates a right to contribution for parties already subject to liability in . . . a section 107 action . . . ." *NCR Corp. v. George A. Whiting Paper Co.*, 768 F.3d 682, 690 (7th Cir. 2014). Unlike § 107(a)'s default joint and several liability, however, § 113(f) vests district courts with "broad and loose" authority to allocate response costs among PRPs. *Id.* at 695. Indeed, "even a defendant who concedes statutory liability may argue that it should bear none of the costs of response." *Id.* at 690.

Battery Properties resists summary judgment on Graymor's § 107(a) claim on the grounds that Graymor "ignores its own liability" as a PRP, despite the fact that both Defendants' contribution counterclaims remain pending. Dkt. 161 at 6. Relatedly, Battery

Properties argues that Graymor's BFPP defense has yet to be resolved, further precluding resolution of Graymor's § 107(a) claim. *Id.* at 8. These arguments by Battery Properties are misplaced and unavailing.

First, Battery Properties's argument misapprehends the interplay between Graymor's cost recovery claim under § 107(a) and Defendants' contribution counterclaims under § 113(f). A "PRP's right to contribution under § 113(f)(1) is contingent upon an inequitable distribution of common liability among liable parties," meaning that the viability of Battery Properties's and CMW's contribution counterclaims depends, first and foremost, on a finding of their liability to Graymor. *Atl. Rsch. Corp.*, 551 U.S. at 139; *accord NCR Corp.*, 786 F.3d at 691 ("Section 113(f) is closed to a litigant without a preexisting or pending liability determination against it even if it wants to proceed by that route, because that statute creates a right to contribution, and contribution exists only among joint tortfeasors liable for the same harm."). If, by contrast, Defendants are not found liable to Graymor under § 107(a), then neither Battery Properties nor CMW has grounds to seek contribution from Graymor under § 113(f). *Mervis Indus., Inc. v. PPG Indus., Inc.*, No. 1:09-cv-0633-SEB-JMS, 2010 WL 1381671, at *6 (S.D. Ind. Mar. 30, 2010) (denying motion to dismiss § 113(f) counterclaim and noting that, to the extent that liability is established under § 107(a), the liable party "may seek contribution pursuant to 113(f) to ensure that costs are equitably distributed"); *see also* Battery Props.'s Answer & Countercl. ¶ 13, dkt. 27 at 36 (alleging that "[*i*]*f* [*Battery Properties*] *is found liable in this action*, then Graymor is liable to [Battery Properties]") (emphasis added); CMW's Answer & Countercl. ¶ 13, dkt. 49 at 39 (alleging that

"[*i*]*f CMW is found liable in this action*, then Graymor is liable to CMW") (emphasis added).

The relationship between §§ 107(a) claims and 113(f) counterclaims leads to a second point: Since no party has moved for summary judgment on Battery Properties's and CMW's counterclaims and/or Graymor's BFPP defense, any question concerning Graymor's liability, whatever it may be, exceeds the scope of the present motion(s). A subsequent phase of this litigation will likely entail resolution of the contribution counterclaims, at which time we may properly assess "the equitable apportionment of costs among the liable parties, *including the PRP that filed the § 107(a) action*." *Atl. Rsch. Corp.*, 551 U.S. at 140 (emphasis added). Accordingly, we shall resolve Graymor's motion for summary judgment as to its § 107(a) claim (concerning Defendants' liability to Graymor) without regard to the disposition of Defendants' § 113(f) counterclaims (concerning Graymor's liability to Defendants). *Valbruna Slater Steel Corp. v. Joslyn Mfg. Co.*, No. 1:10-cv-044-JD, 2015 WL 8055999, at *3 (N.D. Ind. Dec. 4, 2015) (postponing consideration of equitable contribution factors until after resolution of § 107(a) claim).

## B.    Recoverable Response Costs

We turn now to determine whether Graymor has shown that its past response costs are recoverable under § 107(a). "Congress permitted the recovery of necessary response costs incurred 'consistent with' the National Contingency Plan or NCP, a federal regulation that establishes standards and obligations for remediation and cleanup efforts." *Von Duprin*, 12 F.4th at 770 (quoting 42 U.S.C. § 9607(a)(4)(B)). Accordingly, to satisfy this element

23

of its § 107(a) claim, Graymor must demonstrate that its expenses were both necessary and consistent with the NCP.

Response costs are "necessary" if they are incurred in order to address a threat to human health or the environment. *G.J. Leasing Co. v. Union Elec. Co.*, 854 F. Supp. 539, 561–62 (S.D. Ill. 1994) ("*G.J. Leasing Co. I*"), *aff'd*, 54 F.3d 379 (7th Cir. 1995) ("*G.J. Leasing Co. II*"). "The statutory limitation to 'necessary' costs of cleaning up is important" because "[w]ithout it there would be no check on the temptation to improve one's property and charge the expense of improvement to someone else." *G.J. Leasing Co. II*, 54 F.3d at 386. Thus, Graymor "must establish an actual and real public health threat exists prior to initiating a response action." *G.J. Leasing Co. I*, 854 F. Supp. at 562. Whether particular response costs are necessary is a mixed question of law and fact. *See G.J. Leasing Co. II*, 54 F.3d at 386. "Summary judgment is appropriate for the purposes of determining [Defendants'] liability if the undisputed facts demonstrate that at least some of [Graymor's] response costs were necessary." *Valbruna Slater Steel Corp.*, 2015 WL 8055999, at *4 (citing *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 782 (7th Cir. 2000)).

Relatedly, a "private party response action will be considered 'consistent with the NCP' if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements . . . and results in a CERCLA-quality cleanup." 40 C.F.R. § 300.700(c)(3)(i). "The requirements are numerous and task specific," though "[p]erfect compliance is not the measuring stick." *Von Duprin*, 12 F.4th at 770 (citing 40 C.F.R. § 300.700(c)(5)–(6)). "The ultimate and controlling inquiry is whether the expenses in question were incurred in 'substantial compliance' with the NCP." *Id.* (citing 40 C.F.R. §

300.700(c)(3)(i)). A private plaintiff can demonstrate its compliance with the NCP through evidence of a state environmental agency's involvement in and oversight of the party's cleanup and remediation work. *See NutraSweet Co.*, 227 F.3d at 791 (holding that district court did not clearly err in concluding that state environmental agency's oversight in cleanup established substantial compliance with the NCP).

Here, Graymor contends that the costs it has incurred are recoverable because "IDEM has overseen and regulated Graymor's efforts to address the contamination" at the Site, as evidenced by IDEM's December 10, 2024, technical approval letter regarding Graymor's data gap site investigation work plan. Dkt. 133 at 16 (citing dkt. 155). Defendants challenge both the necessity of Graymor's expenditures as well as whether such costs were incurred consistent with the NCP. Graymor's purported response costs, Defendants argue, were not legally necessary because their own (respective) remediation efforts were underway long before Graymor purchased the Site and interrupted their progress in February 2023. According to Battery Properties and CMW, any PFAS-related expenditures incurred by Graymor were voluntarily undertaken, since IDEM did not require Graymor to investigate PFAS, and thus do not qualify as necessary response costs. Battery Properties also asserts that IDEM's December 10, 2024, technical approval letter reflects nothing more than IDEM's "ministerial" oversight, which falls short of the type of involvement necessary to establish compliance with the NCP.

After carefully reviewing the record, we find that genuine issues of material fact concerning the nature and necessity of Graymor's response costs preclude the entry of summary judgment on the issue of Defendants' liability to Graymor under § 107(a). Although

it appears that IDEM certainly has authorized Graymor to conduct additional investigations in order to assess the presence of PFAS at the Site, Graymor has not conclusively or persuasively shown that such investigations were *necessary* to address a threat to public health or the environment. IDEM's technical approval of Graymor's proposed PFAS investigations notwithstanding, the record contains countervailing evidence regarding the immediacy of the risk posed by PFAS. For example, Graymor's own expert witness, Mr. Schnapf, acknowledged at his deposition that "the issue of PFAS at sites and the environmental context is a relatively new occurrence" such that state and federal authorities have not yet firmly established the appropriate screening levels for PFAS. Schnapf Dep. 104:23–105:6, dkt. 165-4 at 3. Similarly, IDEM has itself expressed its "belie[f] that the PFAS (*if determined to require remediation*) can be addressed in a separate phase of mitigation . . . ." Dkt. 165-1 at 2 (March 27, 2025, email from IDEM to Graymor) (emphasis added). In construing this evidence in the light most favorable to Battery Properties and CMW as the non-movants, we hold that a reasonable factfinder could conclude that Graymor's expenditures relating to PFAS mitigation were not necessary to contain a threat to public health or the environment.

Graymor's contentions addressed in its reply brief are similarly unavailing. According to Graymor, its PFAS-related expenses "are not the only necessary response costs" that is has incurred. Dkt. 169 at 8. Although Graymor's reply brief does not enumerate, much less explain, its alleged response costs, it does cite to Mr. Litwack's deposition testimony vaguely describing certain payments for liability insurance, County taxes, EFI invoices, attorney fees, and fence repairs. Litwack Dep. 80:21–83:23, dkt. 128-3. Graymor's failure

to relate these alleged payments to any *necessary* response costs buttresses our conclusion that Graymor is not entitled to summary judgment in its favor at this time. Accordingly, Graymor's request for summary judgment on the question of Defendants' liability under § 107(a) shall be **denied**. Because we deny summary judgment on the grounds that Graymor has failed to establish the "necessity" of its alleged response costs, we do not reach the question of whether such costs were consistent with the NCP.

## III.    Battery Properties's and Graymor's Cross-Motions for Summary Judgment on Graymor's ELA Claim

Graymor and Battery Properties have cross-moved for summary judgment on Graymor's ELA claim. Section 13-30-9-2 of the Indiana Code provides that "[a] person may . . . bring an environmental legal action against a person that caused or contributed to the release to recover reasonable costs of a removal or remedial action involving the hazardous substances or petroleum." Ind. Code § 13-30-9-2. As a complete defense to liability, Battery Properties invokes Indiana's VRP statute, which confers participants with certain protections against Title 13 claims. Below, we first address Battery Properties's immunity defense before turning to the merits of Graymor's ELA claim against Battery Properties and CMW.

### A.    Battery Properties's Interim Immunity

Section 13-25-5-18(g) of the Indiana Code states as follows:

> After an applicant and the [IDEM] have signed a voluntary remediation agreement, a person may not bring an action, including an administrative action, against the applicant . . . for any cause of action arising under [Title 13] or rules adopted under [Title 13] and relating to the release or threatened release of a hazardous substance or petroleum that is the subject of the agreement.

27

Ind. Code § 13-25-5-18(g) ("subsection 18(g)").[5]

Upon the VRP participant's successful completion of an approved remediation work plan, a second form of immunity becomes available; to wit, once the IDEM commissioner issues a certificate of completion, *see id.* § 13-25-5-16, "the governor shall also provide the person with a covenant not to sue for any liability, including future liability, or a claim resulting from or based upon the release or threatened release of a hazardous substance or petroleum that is addressed by an approved voluntary remediation work plan . . . ." *Id.* § 13-25-5-18(a). Together, these liability protections that are built into "the Voluntary Remediation Program ha[ve] a very specific purpose: to facilitate the sale and reuse of industrial and commercial properties by assuring the property owner (and future transferees) that no additional environmental actions will be instituted against them." *Reed v. Reid*, 980 N.E.2d 277, 288–89 (Ind. 2012) (citation modified); *accord Cooper Indus., LLC v. City of S. Bend*, 899 N.E.2d 1274, 1281 (Ind. 2009) (describing the VRP "scheme" as one example of the "legislative effort to address brownfields" by "encourag[ing] their remediation").

In this case, Battery Properties argues that it has interim immunity from suit under subsection 18(g) because it has been actively engaged in the voluntary remediation process since November 2000, when it and IDEM signed a VRA. Dkt. 128-8. According to Battery Properties, the 2000 VRA remains valid and enforceable and, thus, completely bars Graymor's ELA claim.

---

[5] Subsection 18(g) was originally enacted as subsection 18(e) but was recodified as subsection 18(g) in 2009. *See* 2009 Ind. Legis. Serv. P.L. 78-2009 § 19 (H.E.A. 1162) (West) (amending the Indiana Code concerning environmental law).

Graymor does not dispute the existence of the 2000 VRA to which Battery Properties and IDEM are parties, though it contends that Battery Properties lacks immunity for several reasons. First, Graymor argues that the VRP's "limited protections . . . apply only when an applicant completes remediation at its own expense" and obtains a covenant not to sue from the Governor. Dkt. 163 at 10–11 (citing Ind. Code § 13-25-5-18).[6] Contrary to Graymor's assertion, however, subsection 18(g) plainly states that "a person may not bring an action . . . for *any* cause of action arising under" Title 13 "[*a*]*fter* an applicant and the department have signed a voluntary remediation agreement." Ind. Code § 13-25-5-18(g) (emphasis added). In this case, Battery Properties (i.e., "an applicant") and IDEM (i.e., "the department") signed the 2000 VRA. Thus, unless an exception applies, subsection 18(g) bars Graymor's ELA claim, which arises under Title 13, against Battery Properties, and the fact that remediation work remains ongoing does not dictate otherwise. *Hostetler v. Johnson Controls Inc.*, No. 3:15-cv-226 JD, 2021 WL 4477463, at *10 (N.D. Ind. Sept. 30, 2021) (rejecting similar argument and holding interim immunity barred plaintiff's ELA claim against VRP participant even though remediation work was incomplete).

---

[6] In support of its contention that Battery Properties's immunity is contingent upon the completion of remedial work as well as receipt of a covenant not to sue, Graymor also cites to § 7 of the ELA, which states: "Notwithstanding any provision of this chapter, a person that receives a covenant not [to] sue under IC 13-25-5-18 is exempt from suit as provided in IC 13-25-5-18." Ind. Code § 13-30-9-7 ("ELA § 7"). Since Graymor does not explain this argument further, however, we do not address the interplay between ELA § 7 and § 13-25-5-18 except to say that, absent a showing that two statutes are "irreconcilable," Indiana law requires courts "to reconcile and harmonize" dualling statutes and "give effect to both provisions." *Rodriguez v. State*, 129 N.E.3d 789, 796 (Ind. 2019) (citation modified). In this case, there has been no showing that ELA § 7 and § 13-25-5-18 are incompatible, and, as such, we do not read ELA § 7 as excepting subsection 18(g) from the protections available under § 13-25-5-18.

Graymor next argues that its ELA claim exceeds the scope of whatever protections Battery Properties might otherwise have by virtue of the 2000 VRA. Subsection 18(g) protects applicants from causes of action "relating to" hazardous substances that are "*subject of the agreement*." Ind. Code § 13-25-5-18(g) (emphasis added). Here, it is undisputed that remediation pursuant to the 2000 VRA has thus far focused on certain CVOCs, SVOCs, PCBs, and metals at the Site. According to Graymor, however, its ELA claim concerns the presence of PFAS, which substances are not a "subject of" the 2000 VRA and thus fall beyond the scope of subsection 18(g)'s interim immunity.

Neither Graymor's May 2023 Complaint, dkt. 1, nor its May 2025 Statement of Claims, dkt. 123, includes a single reference to PFAS as the underlying factual basis of the ELA claim, despite evidence that Graymor knew about the potential presence of PFAS at the Site in January 2023, when EFI completed a Phase I investigation report. To that end, Battery Properties contends that Graymor raises the PFAS issue "for the first time in its [r]esponse" brief. Dkt. 167 at 5. According to the Seventh Circuit, "[a]n attempt to alter the factual basis of a claim at summary judgment may amount to an attempt to amend the complaint." *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 859 (7th Cir. 2017). District courts "retain[ ] discretion to treat new claims presented for the first time in briefing as a constructive motion to amend," though the Seventh Circuit has cautioned that "[i]t will rarely be appropriate to do so." *Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 490 (7th Cir. 2023). Indeed, "only when the general principles governing amendment of a complaint are satisfied should constructive amendment be permitted . . . , [and] justice will rarely require leave to amend in the context of new claims presented for the first time in

opposition to a motion for summary judgment." *Id.* at 489; *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend the pleadings] when justice so requires.").[7]

To the extent that Graymor seeks to redefine the factual basis of its ELA claim through its summary judgment response brief, it has failed to show that this case presents one of the "rare" circumstances under which a *de facto* amendment is appropriate. In the circumstances presented here, we discern no basis on which justice might permit Graymor to introduce new factual underpinnings to its ELA claim at this late stage of the litigation.

Graymor's final argument is that Battery Properties has no immunity because it failed to submit an RWP to IDEM within 180 days of entering into the 2000 VRA, as required by the Indiana Code as well as the terms of the 2000 VRA. Subsection 18(g) provides that immunity from suit "does not apply if: (1) the applicant fails to file a proposed voluntary remediation work plan within the time period established in section 8(a)(8) of this chapter." Ind. Code § 13-25-5-18(g)(1). Section 8(a)(8), in turn, requires the applicant to submit a voluntary remediation work plan proposal to IDEM "(A) not later than one hundred eighty (180) days after the date the voluntary remediation agreement is signed; or (B) after a longer period if the extension is agreed to by the department and the applicant." *Id.* § 13-25-5-8(a)(8).

---

[7] Battery Properties maintains, without further elaboration, that VRP applicants need not enumerate every contaminant that might exist at an impacted site, meaning that the (potential) presence of PFAS at the Site is immaterial to its interim immunity. Dkt. 167 at 4. Whether or to what extent subsequently-discovered contaminants, like PFAS here, affect subsection 18(g)'s protections has not been adequately briefed by the parties. We, therefore, express no view as to merits of this issue.

The parties stipulate that Battery Properties's (first) RWP was submitted to IDEM on December 5, 2003, dkt. 128-4, more than 920 days *past* the statutory 180-day deadline. The viability of Battery Properties's interim immunity thus turns on whether IDEM and Battery Properties "agreed to" an extension of time for the submission of an RWP. *See* Ind. Code § 13-25-5-8(a)(8).

Graymor contends that Battery Properties cannot adduce any record evidence showing that IDEM agreed to extend the 180-day deadline. Battery Properties rejoins that "documentary evidence" is not necessary to prove the existence of "several" extension agreements when the record makes it "patently and plainly obvious" that IDEM "approved all phases of [Battery Properties's] investigation work, approved [Battery Properties's] 2003 and 2025 RWPs, and never terminated the VRA," dkt. 167 at 3–4.

In the absence of direct and/or uncontroverted evidence that Battery Properties and IDEM specifically, expressly agreed to any, never mind "several," extensions of time for the submission of an RWP, it is not clear that Battery Properties has demonstrated its entitlement to judgment as a matter of law. Certainly, as Battery Properties insists, the record does show that IDEM and Battery Properties maintained continual, albeit irregular, correspondence relating to *investigatory* work at the Site. *See generally* dkt. 128-13 through 128-28. However, these communications fall short of establishing if, when, or how IDEM authorized Battery Properties to delay the submission of a *remediation* work plan for nearly three years. *Cf. Aimco Michigan Meadows Holdings, LLC v. Genuine Parts Co.*, No. 1:05-cv-088-LJM-WTL, 2006 WL 897875, at *2 (S.D. Ind. Mar. 31, 2006) (granting summary judgment where VRP applicant adduced evidence of IDEM representative's affidavit,

which "ma[de] it clear that the extension agreement was agreed to by the parties"). Relatedly, while IDEM has not exercised its contractual (or statutory) authority to void the 2000 VRA, it has not affirmatively represented that it "agreed to" an extension agreement. IDEM did retain the discretion to overlook Battery Properties's timeliness, however, regardless of whether it had specifically agreed to an extension of time. *See* dkt. 128-8 at 6 ("If Applicant fails to submit the Work Plan within that period the Agreement is voidable *at the discretion of IDEM*.") (emphasis added).

In reviewing Battery Properties's summary judgment motion, we draw all reasonable inferences in favor of the nonmovant, Graymor. Doing so, we conclude that a genuine issue of material fact exists as to whether IDEM and Battery Properties agreed to an extension of time for the submission of an RWP. Because Battery Properties has failed to adduce specific record evidence demonstrating the absence of a genuine dispute concerning whether Battery Properties and IDEM "agreed to" an extension of time for the submission of a remediation work plan, as set forth in Indiana Code § 13-25-5-8(a)(8)(B), summary judgment is not appropriate. Accordingly, Battery Properties's motion for partial summary judgment on the issue of its interim immunity under subsection 18(g) shall be **denied**.

### B.    Graymor's ELA Claim against Battery Properties & CMW

We turn next to Graymor's request for summary judgment on its ELA claims against Battery Properties and CMW. As noted above, § 13-30-9-2 of the Indiana Code authorizes plaintiffs to " 'recover reasonable costs of a removal or remedial action' involving hazardous substances or petroleum." *Bernstein v. Bankert*, 733 F.3d 190, 216 (7th Cir. 2013) (quoting *Cooper Indus., LLC*, 899 N.E.2d at 1280). Graymor argues that it is entitled to

summary judgment on the same grounds as those that support its CERCLA claim: to wit, Defendants "unquestionably" caused contamination at the Site and are therefore liable to Graymor for the reasonable response costs it has and will incur. Dkt. 133 at 18–19.

The "ELA statute provides a cause of action closely resembling the cost recovery provisions in CERCLA Section 107, [though] they are not the same." *Reed*, 980 N.E.2d at 287–88. One such difference pertains to the recoverability of response costs: The ELA requires that the costs sought be "reasonable," whereas CERCLA requires that response costs be necessary and consistent with the NCP. *See id.* at 288.

Here, Graymor has neither adduced evidence nor persuasively argued that it has incurred "reasonable" response costs within the meaning of the ELA. We, therefore, can make short work of Graymor's request for summary judgment on the question of Battery Properties's and CMW's liability under the ELA. Because Graymor's motion is insufficiently supported by the record before us, it shall be **denied**. *See Hotel 71 Mezz Lender LLC*, 778 F.3d at 603.

## IV.    Graymor's Motion for Summary Judgment on CMW's Breach-of-Contract Counterclaim

The essential elements of a breach of contract claim under Indiana law are "the existence of a contract, the defendant's breach of that contract, and damages resulting from the breach." *Haegert v. Univ. of Evansville*, 977 N.E.2d 924, 937 (Ind. 2012). As explained below, CMW and Graymor have entirely failed to adhere to this legal framework in advancing their respective positions, thereby impeding the Court's straightforward assessment of the disputed and undisputed elements of CMW's counterclaim. That said, our

independent review of the record discloses that CMW's breach-of-contract counterclaim is factually and legally unavailing on multiple grounds.

CMW's breach-of-contract counterclaim arises out of the Purchase Agreement, which, CMW avers, "bar[s] or diminish[es] Graymor's claims and alter[s] the rights and obligations of each CMW and Graymor with respect to the [Site] and its environmental conditions." CMW's Answer & Countercl. ¶ 19, dkt. 49 at 40. Although CMW initially invoked nine separate contract provisions as bases of its counterclaim, *see id.*, its response in opposition to Graymor's motion for partial summary judgment relies upon only the following sections:

> <u>5.4</u>: Each of the parties will pay its own attorney's fees except that a party defaulting under this Agreement or any Closing Documents will pay the reasonable attorney's fees and court costs incurred by the nondefaulting party which is successful in enforcing its rights hereunder.
>
> . . .
>
> <u>9.1</u>: Seller is conveying the Real Property in its **"AS IS" AND "WHERE IS"** condition as to all conditions, whether known or unknown, latent or open.
>
> . . .
>
> <u>Section 14</u>: The paragraph headings or captions appearing in this Agreement are for convenience only, are not a part of this Agreement, and are not to be considered in interpreting this Agreement. This written Agreement constitutes the complete agreement between the parties and supersedes any prior oral or written agreements between the parties regarding the Real property. There are no verbal agreements that change this Agreement, and no waiver of any of its terms will be effective unless in a writing executed by the parties, unless otherwise provided for in this Agreement. This Agreement binds and benefits the parties and their successors and assigns. This Agreement has been made under the laws of the State of Indiana, and such laws will control its interpretation.

Dkt. 132-2 at 5, 8, 10 (capitalization and bold in original). Drawing on these provisions, CMW alleges that by initiating this environmental cleanup litigation and by specifically seeking an award of attorneys' fees, both of which the Purchase Agreement purportedly forbids, Graymor breached the terms of the Purchase Agreement. CMW's Answer & Countercl. ¶ 24, dkt. 49 at 41; dkt. 164 at 11.

The underlying error in CMW's breach-of-contract theory, which neither party has addressed, emanates from its designation as a "counterclaim," rather than as a defense. "Federal courts distinguish between when a defendant seeks to reduce the amount a plaintiff can recover" and when a defendant seeks to obtain "affirmative relief over and beyond defeating a claim." *SkyBitz Tank Monitoring Corp. v. Fleetwing Corp.*, No. 22-cv-6294, 2026 WL 266554, at *5 (N.D. Ill. Feb. 2, 2026); *see Bell v. Taylor*, 827 F.3d 699, 704–05 (7th Cir. 2016). A "defense," on one hand, reflects a "defendant's stated reason why the plaintiff . . . has no valid case" as well as "why the plaintiff should not recover or establish that which he seeks by his complaint or petition." *Defense*, Black's Law Dictionary (12th ed. 2024). A "counterclaim," on the other hand, describes "[a] claim for relief asserted against an opposing party after an original claim has been made; [especially] a defendant's claim in opposition to or as a setoff against the plaintiff's claim." *Counterclaim*, Black's Law Dictionary (12th ed. 2024). Another key distinction between defenses and counterclaims is that "[a] defense cannot possibly be adjudicated separately from the plaintiff's claim to which it applies; a counterclaim can be." *Reiter v. Cooper*, 507 U.S. 258, 265 (1993).

Here, CMW's pleading and summary judgment response brief clearly demonstrate that the purpose of CMW's "counterclaim" is an attempt to foreclose and/or limit Graymor's entitlement to certain monetary damages. By contrast, CMW does not assert a counterclaim for monetary damages flowing from an injury caused by Graymor's alleged breach of the Purchase Agreement. Moreover, the outcome of CMW's "counterclaim"—and whether an award of damages to Graymor is subject to certain reductions—hinges entirely on CMW's potential liability to Graymor under the ELA and CERCLA, suggesting that the breach-of-contract averments cannot possibly be "adjudicated separately" from Graymor's claims. *See id.* For these reasons, we hold that CMW's argument that the Purchase Agreement fore-closes and/or reduces its liability to Graymor is a *defense*—not a counterclaim. *See, e.g.*, *Buller v. Owner Operator Indep. Driver Risk Retention Grp., Inc.*, 461 F. Supp. 2d 757, 767 (S.D. Ill. 2006) (treating purported counterclaim as an affirmative defense where the counterclaimant alleged grounds for avoiding or reducing liability—not for recovering an award of damages independent from the merits of the plaintiff's claims); *Hinfin Realty Corp. v. Pittston Co.*, 206 F.R.D. 350, 354–55 (E.D.N.Y. 2002) (defendant's nominal "coun-terclaim" in environmental cleanup action was an affirmative defense, not a counterclaim).

Our conclusion that CMW's counterclaim is in actuality an affirmative defense is further buttressed by the misalignment between CMW's factual allegations and the essen-tial elements of a breach-of-contract claim. For instance, establishing a breach requires a showing that the breaching party "fail[ed] to perform all of the obligations that it . . . agreed to undertake." *Breeding v. Kye's Inc.*, 831 N.E.2d 188, 191 (Ind. Ct. App. 2005). Viewing CMW's counterclaim allegations through this lens, we cannot understand how Graymor's

alleged misconduct—e.g., initiating this litigation—qualifies as a "fail[ure] to perform," *id.*, under Sections 5.4, 9.1, or 14 of the Purchase Agreement. CMW does not cogently or persuasively explain how Section 9.1's exculpatory "as is" clause concerning conditions at the Site reflects an enforceable promise by Graymor not to pursue statutory remedies. Similarly, CMW's perfunctory contention that Graymor breached Sections 5.4 and 14 of the Purchase Agreement is unaccompanied by any legal and/or factual support demonstrating how Graymor's actions constitute breaches thereof.

For these reasons, Graymor's motion for summary judgment shall be **granted** to the extent that CMW's breach-of-contract theory fails factually and legally to support any independent basis for relief. However, where, as here, "a party mistakenly designates a defense as a counterclaim, . . . the court must, if justice requires, treat the pleading as though it were correctly designated, and may impose terms for doing so." Fed. R. Civ. P. 8(c)(2). Because the existence of "any contracts between the parties bearing on the allocation of cleanup costs" is highly relevant to the court's allocation of "response costs among liable parties" under § 113(f) of CERCLA, CMW shall be permitted to raise defensive arguments relating to the Purchase Agreement for the purposes of mitigating its liability. *Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 326 (7th Cir. 1994).

## CONCLUSION

For the foregoing reasons, the Court hereby rules as follows:

- Battery Properties's Motion for Partial Summary Judgment is **GRANTED** as to Graymor's negligence and negligence *per se* claims; and **DENIED** as to its interim immunity against Graymor's ELA claim. Dkt. 126.

- Graymor's Motion for Partial Summary Judgment is **GRANTED** as to CMW's breach-of-contract counterclaim and **DENIED** as to Graymor's CERCLA and ELA claims. Dkt. 129.

- CMW's Motion for Partial Summary Judgment is **GRANTED** as to Graymor's negligence and negligence *per se* claims. Dkt. 130.

- Insofar as is relevant to the allocation of cleanup costs among liable parties, CMW's averments relating to the Purchase Agreement shall be **REDESIGNATED** as a defense, rather than a counterclaim.

No partial final judgment shall issue.

The following claims remain for trial:

- Graymor's cost recovery claim against Battery Properties and CMW, pursuant to § 107(a) of CERCLA;

- Battery Properties's and CMW's contribution counterclaims against Graymor, pursuant to § 113(f) of CERCLA; and

- Graymor's ELA claim against Battery Properties and CMW, pursuant to § 13-30-9-2 of the Indiana Code, including the resolution of Battery Properties's interim immunity under § 13-25-5-18(g) of the Indiana Code.

This matter shall proceed accordingly.

**IT IS SO ORDERED.**

Date: _____3/11/2026_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Matthew Thomas Albaugh
Taft Stettinius & Hollister LLP
malbaugh@taftlaw.com

Joseph C. Chapelle
BARNES & THORNBURG, LLP (Indianapolis)
joe.chapelle@btlaw.com

Mark Jason Crandley
BARNES & THORNBURG, LLP (Indianapolis)
mcrandley@btlaw.com

John Paul Fischer, Jr.
BARNES & THORNBURG, LLP (Indianapolis)
john.fischer@btlaw.com

Kristin Leigh Froehle
Barnes & Thornburg LLP
kristin.froehle@btlaw.com

David R. Gillay
Barnes & Thornburg
david.gillay@btlaw.com

Edward S. Griggs
BARNES & THORNBURG, LLP (Indianapolis)
sean.griggs@btlaw.com

David Guevara
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
dguevara@taftlaw.com

David Hatchett
HATCHETT & HAUCK LLP
david.hatchett@h2lawyers.com

Michael Jonathan Reeder
HATCHETT & HAUCK LLP
mike.reeder@h2lawyers.com

Edward Henry Satchwill, III
Office of the Indiana Attorney General
edward.satchwill@btlaw.com

Clayton Smith
Taft Stettinius & Hollister LLP
cjsmith@taftlaw.com

William Philip Sweet
Taft Stettinius & Hollister LLP
wsweet@taftlaw.com

Clarissa Vaillancourt
Barnes & Thornburg LLP
claire.vaillancourt@btlaw.com